In Case No. 20-5008 et al., American Forest Resource Council v. United States of America et al., Soda Mountain Wilderness Council et al., Mr. Toedt for the federal appellants, Ms. Boyles for the appellants of Soda Mountain Wilderness Council et al., Mr. Bethel for the Appalachian American Forest Resource Council et al., Mr. Renfjord for the Appalachian Association of ONC Counties et al., Ms. Weiss for the Appalachian Starfire Lumber Code and South Coast Lumber Code. As this court knows, this set of appeals arises from disputes concerning approximately two million acres of federal managed land in the Pacific Northwest that has been managed for decades with an understanding that there is a balancing process when it comes to applying multiple statutes that dictate the management of the complex set of natural resources in this region. The district court here, in terms of the ruling, erroneously disrupted that settled understanding of how these lands are managed. And that settled understanding has been ascended to by Congress through a series of amendments. And the district court here in many respects that we outlined in our brief, but I'd like to focus my presentation this morning on one overriding theme, which is that the district court failed to rigorously, rigorously oppose some plaintiffs. The district court failed to rigorously apply plaintiffs, their heavy burden under EPIC systems to demonstrate a clear congressional intent that the Oregon and California Lands Act displaced the government's other responsibilities under other applicable statutes. The court's failure here stems from three different components of the analysis, the statutory text, the statutory history, and finally, the congressional enactments that demonstrate Congress's implicit assent to the way that the land is managed. Before I turn to those argument points, I'd like to just provide a little bit of context for why this is such an extraordinary set of cases. The district court's decisions were unprecedented in three different respects. As to the monument challenge, this is the first time that a district court that we know of has ever issued declaratory relief against the president invalidating presidentially proclaimed national monuments. The Antiquities Act has been, it was enacted in 1910, it's been on the books for over 100 years, yet this is the first district court to invalidate a presidential proclamation of a national monument. As to the plan cases, this district court decision is unprecedented because for over 25 years with the approval of the district courts in the Western District of Washington and the District of Oregon as affirmed by the Ninth Circuit, there has been a management regime in place known as the Northwest Forest Plan Amendment. And that has been accepted as a compromise between timber industry and environmental interests. It hasn't always, you know, sometimes it works out to the benefit of one side or the other, but it has been understood to be a settled balance for land management. And again, the district court disrupted that settled understanding. Contrary to the only court ever to consider the question of whether the O&C Act and the reserves on the plan managed land to be reconciled. And then finally, when you say the question is whether the O&C Act has displaced other statutes, isn't, don't you have it in reverse? It's whether this proclamation under the Monuments Act has displaced the O&C Act? I mean, that's been in existence since the 30s, so it's not displacing anything. The question is whether it's being displaced. Well, I think you could look at it either way. The way I'm seeing it is the president exercised the authority on the statute that existed before the O&C Act. And so you have to look to, and I don't know that the timing necessarily dictates the outcome because we have statutes that were passed before the O&C Act. We have statutes that were passed after the O&C Act. I think the fundamental mode of analysis is to look to whether plaintiffs have met their clear burden of demonstrating that the statute. What's the statute other than the Antiquities Act? And it's not the Monument Act. I get them all thrown together. But what's another statute that has, I mean, the Antiquities Act is older than the O&C Act. What other statutes are you talking about that are more recent than the O&C Act? For the plan, they're relevant to the plan cases, not the monument cases directly, but the Clean Water Act and the Endangered Species Act, later enacted. But still, I think the timing is useful to look at. Certainly, turning to the monument case first, I think there's a clear path to reversal in that the Antiquities Act expressly confers powers on the president himself. The Oregon and California Lands Act doesn't mention the president at all. And you would expect that if it's going to take away those expressly delegated powers, which my friends on the other side point out stemmed from Congress's exercise of its property clause authority, it lawfully delegated that through the Antiquities Act to the president. You would expect that if Congress intended to take that back, it would mention the president in Oregon and California, and they don't. But that sets that case apart from the plan challenges, and is a way that shows that the statutes can be reconciled, and therefore, under ethnic systems, they must. So, I understand your position to be that a president's action under the Antiquities Act is not reviewable. And how do you square that with the Reich case? So, the Reich case involved the two different, you know, the executive order under the Labor Relations Act. The government argued there that the statutes did not facially conflict, and that was the distinction. We would say it's the same distinction here. There is no facial conflict between the mention of the president in the Antiquities Act and the Oregon and California Lands Act. So, we recognize that the government lost on that argument under those different statutes in Reich. We think here it's an easier case that it's not, it's not an easy case, but it's an easier question. Even applying the framework in Reich, there isn't a facial conflict between the Antiquities Act and the Oregon and California Lands Act that can be reconciled. So, it becomes a matter of how much. So, in your view, could the president designate the entire ONC land tract as a monument? I think that would be in a reconcilable conflict, just on the facts. If those were the facts I assume, you know, the proclamations here announced the acreage, right? So, you'd expect, you know, they're publicly known on the face of the proclamation that in that hypothetical way, designate the entire acreage. That seems to be in a reconcilable conflict. The Oregon and California Lands Act deals with an entire set of lands. You know, it stems from this remedy that was given to the counties for violation of these original grants to the railroads, where they didn't give away the land on the terms that Congress had instructed. But that would make it reviewable, just saying the result would be an irreconcilable conflict. Don't we have to review what the president did to determine if there is a conflict or not? I think that's the dilemma. And that's why there aren't a lot of cases that, you know, squarely address this. It doesn't seem like the Mount Stays case or the Tulare case, you know, there's a little fuzziness to the analysis because of the overlap in the merits question and the reviewability question. I think where you are here is trying to judge whether the amount of acreage that was set aside is too much. And that's in the monument. And I think that's a question of the exercise of the president's discretion that is not reviewable under Franklin and under Dalton. But why isn't it just reviewable, but it's reconcilable once we review it? I mean, you know, we recognize that we're bound by right. I think applying our right, we don't think that the proclamation here is, you know, that basically conflicts with the Antiquities Act. We would just rest on that argument. I'm prepared to speak to the merits. I recognize that this court has considered presidential actions in the past. You know, the Supreme Court has notably never squarely decided to resolve this question. So we know that you're preserving. But if I could turn to the merits a little bit more. Not only does the Oregon-California Lands Act not expressly mention the president, but as relevant to both the monument cases and the plan challenges, the statutes can be harmonized. The Oregon-California Lands Act has in its text a lot of places where there is discretion in the wording. And I don't think the district court rigorously looked at the text as the court ought to have to determine whether there was any play in the joint, which is really all that's necessary for there to be discretion that's, you know, subjects the secretary's allegations to the Endangered Species Act, for example, or the Clean Water Act in the plan cases. I just wanted to highlight three features of Section 2601 of Title 43, which is the main text we're talking about in both the plan cases and the monument cases. The first feature of the text that provides discretion is that the lands are referred to as those that may heretofore or may hereafter be classified as timberland. So there's some discretion whether to classify the lands as timberlands. Do you read that to mean, I read, or may hereafter, not to shrink it, but to expand it, expand it, the classification of timberlands? So I mean, which may be classified heretofore or hereafter. It doesn't say maybe classified here before or hereafter reduced. I think there's a recognition that the classification process could be looked at later, not just at its retrospective. I agree. I agree. And I don't think that, maybe the statute doesn't speak to this. Maybe the statute is silent on specifically on this. But I think it's fairly implied that if it can be classified later, that that classification may change. After all, they are going to reduce. Well, I mean, they're going to be cutting lands, right? And so the question is whether, I was very concerned about keeping these lands productive in the long term. And this dovetails with the statutory history. The statute was just being liquidated for the benefit of generating revenue for the counties. And that was one, not generating enough revenue, but two, it was only generating revenue in the short term. So Congress had, when it passed the 1937 Act, it moved away from that liquidation regime to a sustained yield management regime. And so that's the second feature of the statute here that provides some discretion. The classification, I think, demonstrates that there's authority to look at the lands and decide which ones are suitable for timberlands. So that necessarily defeats the district court's assumption that all of the, which I think underlies its orders, that every single acre of these 2 million acres, if it's timberlands, had to be cut. So I think that the fact that- So what's the second point of discretion in the ONCF? It's the sustained yield, the reference to being managed for permanent forest production and the conformity with the principle of sustained yield. And this notion of sustained yield sort of embodies this concept of the government being a steward of the resource. It's to get away from this prior liquidated timber regime and to have a forest, essentially a forest that can be sustainably used in the long term to produce timber, to generate revenue, and to achieve these other purposes that the statute goes on to talk about after talking about sustained yield that I think do inform the understanding of that term. Protecting watersheds, for example, providing recreational facilities, contributing to economic stability. All those concepts provide room for both the president to take a small fraction of the lands, the general lands. We're talking about- I want to get back to the classification point because in 1916, the definition of timberland reduced to down to 7,500 board feet per acre. Is that correct? For the 40-acre, it was 300,000. I think that's 7,500 an acre, which is a very dense forest. And my question is, in 1916, I imagine the forest in Oregon was just as dense as it could be. Is there any area of the ONC land that still meets that? I realize that the 1937 Act repealed in part at least the 1916. And the only definition of what is timberlands that I could find was this 1983 classification used by Interior for timber production capability. So, can you tell me what it is now that defines timberlands? How many board feet per acre? I don't know the exact criteria offhand. I'm familiar with- Do you know if it exists? They do have criteria. They're similar, I believe, to the ones that you just read. My point about the classification is not so much that classification is the way that the government segregated the lands here, either through the monument or through the reserves and plans, but only that when you're looking at the statute and you see that it be it according to that technical definition or be it according to these other broader concepts like sustained yield, that that is enough discretion to defeat this notion that statutes are irreconcilable. In your view, is the default that the land is not timberland, it has to be affirmatively classified as timberland to be timberland? Or is the whole thing timberland unless it gets reclassified as something else? I think it's the first, that it had to be classified. I don't want to get too bogged down in this. It demonstrates, I think, that not every acre had to be harvested. It also indicates that there's some further discretion that the Secretary was able to exercise, too. I want to emphasize, and I'm well into my rebuttal time, but I want to answer the Court's questions as fully as I can. I'd like to just briefly highlight Congress's activity in this area. I think this is something that's important to construing the statute that the District Court just ignored or disregarded altogether. It's that Congress has been very actively engaged in, essentially, a dialogue with court rulings that come out in this area, with the actions of the Secretary of the Interior that have come out, with President Clinton's original proclamation of the monument. Congress has assented to through enactments such as the... We're getting into acquiescence. Sorry? Are you getting into congressional acquiescence? Yes. I don't... Well, my colleagues may disagree. I don't think you meet those criteria at all. I guess I would just highlight that there is a legal backdrop that Congress has been actively engaged in. Where it has wanted to adjust monuments, where it has disapproved of monuments, it has adjusted boundaries. It can land out of federal ownership altogether. It has changed the configuration and given land to be managed by other federal agencies. We cite a number of examples of this in our brief on pages seven and eight, but not two. I mean, your point is not technical acquiescence. It's that Congress has never acted to disrupt the fluidity of the situation that we're looking at over the years. That's your principal argument, is this has always changed over the years. The nature of the timber, how much can be harvested, et cetera, has never been static. Congress was sitting there and watching it and they never interposed any objection that would change that. I thought that was your argument. That's right. It doesn't matter whether it's formal acquiescence. It's what's obvious. Congress has never disrupted the process of the president being able to claim and the secretary being able to act pursuant to 2601. I thought your principal objection on 2601 is the district court just gives it a clipped reading. The district court talks simply about, gives a weird reading to sustained yield, and then ignores everything after timber supply, ignores protecting watersheds, regulating steam flow, contributing to economic stability, and providing recreational facilities. That's in the statute that the other side's pointing to. Those are all the goals. It's not just timber supply. I thought that was what you were, because when you see some of the district court's decision, it just ignores the rest of 2601, as I recall. Yes, that's a fair summary of what the district court did. I think the congressional enactment, and yes, and the text is where the court started. The district court did not consider, or recognize. All right, we'll give you some time. Ms. Boyles. Good morning. May it please the court, my name is Kristen Boyles, and I represent the intervenors in only the monument cases today. I have about three points to continue the conversation that you've been having with Mr. Toth. Let me move to the first one, which is taking off where Judge Edwards, where you just were. This question of irreconcilable conflict, and in fact, Judge Pan, you asked as well. There is no irreconcilable conflict between these two statutes, which is what you need to do to find, in order to find an implicit repeal. The statute talks about, the ONC Act talks about permanent forest production. It doesn't talk about commercial timber. It doesn't talk about commercial timber production. It talks about forest production. Then the Act itself goes on to show that it's about more than just the trees in the And those goals are timber, yes. They are protecting watersheds, regulating stream flows, helping to contribute to economic stability of these communities, and providing recreational facilities. The district court below erred by saying, shall means shall, and not reading the rest of the sentence, and not reading the rest of what the Act requires, that shows that this actually, the ONC Act of 1937, is much more of a conservation and land management statute than the timber interests would have you believe. This is the other point to make here, in response to some of my opposing counsel, is that the proclamations themselves do not is allowed if there is a sustained science-based ecological restoration project, which is, as forestry has evolved over the years since 1937, essentially the same sort of science-based forestry management practices that the 1937 Act was envisioning, this protection of all of the values of the forest, not just trees. Is it in the record how long it took for the other objectives to be pursued other than timber? How long? How long it took from 1937. I understand your question, Your Honor. These are all of the goals. Have the streams always been protected? The ESA Act didn't come along until later. Was anybody concerned with these other projects before ESA, clean water, all of that? So, yes, Your Honor. I don't know. Does the record show that? That's all I want to know. The record shows that the agency, BLM here, has been acting to use its discretion about the volume of timber and the way it manages those lands since 1937. It is not said every acre, every timber sale has to go forward. That is not its position. It's been quite discretionary. And, of course, later acts, as you know, come in and provide even more requirements for the agency because it's not unusual for federal land to have multiple laws applied to it. Let me ask one more time. Does the record affirmatively show that from 1937 on, BLM affirmatively pursued the other objectives other than timber? I believe it does, Your Honor. I will point you to two places in the joint appendix. That's joint appendix at 810, starting at 810, and also starting at page 827. Those are two solicitor memos from 1981, and I realize that's not the timeframe you're talking about, but that has the history. Those two memos have the history looking back. And I think that can help answer that question. I just also want to mention that because there is no clear and manifest intent Congress to repeal this law, you need to find that intent or irreconcilable conflict in order to apply a repeal. There's nothing in the Antiquities Act that talks about, sorry, there's nothing in the ONC Act that talks about the Antiquities Act. Congress did repeal laws in the ONC Act. It knows how to do that when it wants to. It repealed the Chamberlain Fares Act and another public land law. And on the issue of not acquiescence, Your Honor, but on Congress's recognition that it doesn't need to step in here because there's no problems, Congress has funded the original monument, which contains ONC Act lands for the last two decades, and approved planning processes for it. It has funded voluntary land exchanges and grazing lease buyouts within the original footprint on the monument. And when the Antiquities Act was recodified in 2014, Congress did absolutely nothing to indicate that there was a problem with ONC Act lands being part of a would respectfully request that you reverse the decision of the district court and confirm the Cascade-Siskiyou National Monument. Thank you. Mr. Bechtold? Since you're with the American Forest Resource Council, can I just ask you, is there any acreage left that fits the definition of the 1916 Act, without regard to whether it still applies? May it please the court, you did pick up correctly that the 1916 Act goes back and looks at how many four feet an acre can grow. That's a very common thing we do in forestry. What you most likely see it done is a forest typing, where you would look at the soil type, look at the fertility of the soil, how much rainfall falls in place, what the Please. There's a button there. Bring the mics forward. Looks like as high as it's going to go. I don't know the exact acreage that meets that, but 304 feet for 40 acres is not a very high given the amount of rainfall. 300,000. It's 300 million four feet. That's not an extremely high number. You would look at soil contents, rainfall, elevation. Essentially what we do on commercial timberland is you have site classes. They have site classes for BLM too. BLM would look at the site class out there, but an awful lot of this is going to meet that definition, no questions asked. The law was written in 1937 very intentionally to ensure that timber was harvested from places that are considered timberlands, just like problems are those lands that are best suited for growing up commercial timber. What I'm curious about is the density of the forest now as compared to 100 years ago. Are there still parts of that forest that are as dense as they were 100 years ago? I'm sure there are places, but that definition isn't going to standing volume. What that definition is going to is the ability of the land to grow timber. Sustainable timber management is some percentage of the estate you're harvesting, some percentage of the estate you're replanting, and some percentage of the estate you're regrowing. As you get those stands to a mature level, you harvest them. When you're classifying timberland based on four feet, you're classifying those lands based on the potential to grow this amount. So just like if you're harvesting corn, how many bushels of corn can you grow on an acre? It's not how many bushels of corn you have in May, how many bushels of corn you have in September. So what that definition is saying is if you put these lands on a sustainable management track, you harvest, replant, and regrow in perpetuity, are those lands going to get there? The answer is yes. Those lands have the same potential to grow timber today that they did back in the day. There are probably places that have those volumes, those stocking volumes that are being harvested. There's probably areas that were harvested last year that certainly do not have those volumes, but they will in 40 or 50 years. There are other interests we have to take into account making the determination as to how much to harvest. That is what sustainability is about. That's what 2601 says. That's what the Clean Water Act says. That's what Endangered Species Act says. There are other lawsuits going on where other statutes are being enforced which will affect how Interior looks at what's available for harvesting, right? Yes, but I think we need to go back to how well things are growing and not growing. It's not a clear number. You don't know that there's a clear number that's going to be there each year. You have to take all of these factors into consideration, right? At the moment of classification of a timberland, at the moment they define something as a timberland, at that point it has to be put into the management bucket, the state yield management bucket. What they're doing here is they're never making that determination of a timberland, particularly as it goes to the Antiquities Act. They're just saying, let's take these lands and set them aside. Never make a determination about a timberland. To serve statutory interests. They're setting them aside. It's not a whimsical set aside. It's set aside pursuant to acts of Congress and the presidential determinations that have been made, right? You may not agree with those determinations, but it's not someone just saying, oh, let's just set aside. I wouldn't agree with that. You wouldn't agree with what? I wouldn't agree with the notion that particularly in my case, as a monument, what the president has said is I want to get these lands. Specifically what he ordered was, I'm going to read from 65.0 as to 372.49, which is 731.8, which is the management mandate. It specifically says, no portion of the monument shall be considered to be suited for timber production, and no part of the monument shall be used in the calculation and provision of a sustained yield of timber. What he's doing is he's taking the antiquities act, saying I want to create an ecological reserve, and so I am going to completely write off the ONC Act mandate to put these lands into sustainable yield management. There's no balance in there as it comes to the monument. But why can't it be that that part is not classified as timber under the ONC Act, and therefore the two acts are reconcilable? It's a monument, and those parts of it that have been ONC land are just not classified as timber under the ONC Act, and it's only two percent of the two million acres that are covered by the ONC Act. So what's the problem? The two responses to that. First, the president never made a determination. He decided this was a national monument. He wanted to make a national monument. He said nothing about timberland. Second, if they were to make a determination of timberland, they would have to go back to exactly what Judge Henderson said. They'd have to go back to the definition of what timberland is. They can't come up with a definition of timberland. It's not about defining timberland. It's about classifying as timberland, which the secretary has discretion to do. We said so in our Clackamas case. I think that discretion is much more limited, and it's limited by the exact definition that, again, Judge Henderson pointed out. He refers back to the Act of 1916. Wasn't that repealed? The 1916 Act was repealed by the 1937 Act. But it's the only place. It references back to it. It repeals it, but it's in the same policy. And again, even if that definition doesn't apply, let's look at the policy of the ONC Act. The policy of the ONC Act is to generate continuous revenues for counties. But you have 98 percent of it left. You can still classify whatever you want on the remaining 98 percent as timberland. And I just don't see, isn't it our job to try to reconcile what the president did under the Antiquities Act with the ONC Act? And doesn't this reconcile it? I don't think it does. Think about it this way. So say I endow a scholarship fund for a million dollars, and I say these should go for underserved Oregonians. And I give it to the university, and the university says, I'm going to spend $50,000 to update my plot. They say, don't worry about that. It's just a small amount. At the end of the day, somebody's still holding the bag. In this case, it's the counties. We have set up... But what if you gave it to them and said, you have discretion to use this as you will? I don't see that discretion. I see the ONC Act... The ONC Act says classified as timber. Somebody has to classify as timber. That is correct. Not all the land is timberland if some of it has to be classified as timber. And that classification has to be reasonably related to the purpose of the Act and also general understanding of what is timberland. And so if you have a forest that's growing that is generating volume for a community, and you decide, I don't want to call that a timberland, not because it's not a timberland, but because I don't want it to be cut down, and I don't want an amount of time. I can finish if you want, but I do think there has to be a standard as to the timberland. You can't just ignore it and ignore the policy and say something else. Who gets to decide what's the standard as to a timberland? In the Antiquities Act, no one ever made that decision. But no, in the ONC Act, it's the secretary. It's the agency. They have discretion to classify lands as timberlands. And I think that there still has to be a rational basis to do that, and if they diverge on that rational basis, it's actually important to look at and define what is a timberland. And I think in that case, just to say it's a timberland because we don't want to harvest it, it's not a timberland because we don't want to harvest it, is arbitrary and capricious. That's all they said. What record are you looking at? That's all they said? We're not going to harvest it because we don't want to? I may have missed the record, and it's okay if it's there. You need to point me to it. That's all the secretary said? My decision for not harvesting is because I don't want to. That's it? You can't be serious. I know you're an advocate, but that's an overstatement in the extreme. That's not what the secretary said. The secretary gave justification for why the position was reached. I wanted to talk classification through my case, which is the Monument case, the Challenging Presidential Act, and Mr. Ames here, we'll get up here in a second and address some of these other issues as to the set-asides and the resurgence of the plan. But as to the Monument, that is unilateral presidential action in which he sets lands aside in violation of the ONC Act without making any determination under the ONC Act at all. He just acted under the Antiquities Act on his own. There was no independent analysis. Does the Antiquities Act give the president that discretion to act? The Antiquities Act. You don't like it, but it doesn't give it? The Antiquities Act does not give the president the authority to violate other acts of Congress. Okay. Thank you for the additional time. Uh-huh. Mr. Ramphur? Okay. Please report. My name is Harold Ramphur. I represent AOC, CND, asking me to affirm the plan case on behalf of all police. I want to start by addressing this issue of classification. I think there's some confusion. The government claims that the act gives ELN discretion to classify lands as timberlands or not, thereby suggesting that it can classify them for some other purpose, like creating reserves. That is not so. ELN's discretion to classify lands is actually governed by statute. The ONC Act itself refers back to the Act of June 9, 1916, which allowed the land to be classified into three different types of properties. Power site lands valuable to the production of water power. Timberlands, which were, as Judge Henderson noted, lands capable of producing 300,000 square feet of timber or more on a 48-acre parcel, and agricultural lands, which are the remainder. The Act of 1916 does also refer to the potential of reclassifying lands, but only to bring them in their true character. And as to Judge Pan's question on whether or not the Act of 1916 was totally repealed, it was not repealed in part. The way in which the land was managed under that Act was changed by the ONC Act. So there is not this broad discretion to simply reclassify lands for another purpose or for the creation of reserves. And we disagree with it. With respect to some of the questions regarding the language of the ONC Act, the government claims that it has discretion to create reserves because the ONC Act provides that the mandate to produce timber on a sustained yield basis is for the purposes of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities, and providing recreational facilities. This language, in our view, really describes the benefits of sustained yield management. It does not displace the mandate itself to manage land for permanent forest production. The language says sustained yield for the purpose of, and then it lists those purposes. It does. That's not saying the end result will be if you cut timber, then all of the rest will follow. It's saying the purposes that you're aiming for are what you just cited. But the Act also talks about the fact that you measure the annual production, productive capacity for such lands. You determine that each year, and that full annual productive capacity is to be sold annually for so much as can be sold. Right. But these other purposes are still in play. Those other purposes are still in play, but they're described largely in benefits of managing on a sustained yield basis. They don't displace the funding. Sustained yield for the purpose of, and then it lists the six things. It does. All of them are things that should be taken into account when you determine what the timber production is going to be. Well, those are actually... Is your argument that anything that grows should be cut down? And if they don't cut it down, they violated the Act? That's not how sustained yield works. Yeah, I know. I didn't think so, but I'm trying to understand what your argument is. So what else is taken into account? Any healthy tree out there should be cut down? No. Don't think about anything else, just whether they're healthy trees. Your Honor is absolutely correct. The ONC Act is different from the prior Act, which were outright liquidation. Anything that can be cut down. That's exactly right. That's the history. That's the history. You change the sustained yield, which is you have a principle, you have a forest, and you keep that forest in place. And as there's new growth, you take it off. It's like interest principle in a bank. And you take nothing else into account. You look at the quality of the growth, period. That's what that statute says. That's what you say. That's what sustained yield means. But what sustained yield is followed by for the purpose of? It gives meaning to sustained yield. And there are a number of purposes in there. And I assume the Secretary has the discretion to take all those into account. Those are things that will result from managing sustained yield. I didn't understand your argument that far. You're saying, no, these are just results. Because if you read it that way, then timber supply is just, I'm not understanding the statute at all. That's not the language. That's not what the language says. My reading, Your Honor, is that if you manage a sustained yield basis, and you have that principle in place, you keep that principle, then you have resulting benefits. That does provide a permanent source of timber supply. That does protect watersheds. That does regulate stream flow. That does contribute to the economic viability of local communities and industries. And that does provide recreational facilities. So it does all those things. And that's exactly what BLM itself acknowledged in the final environmental impact statement to the 2008 plans, where it said, quote, it would be inconsistent with the ONC Act to treat these expected benefits as additional objectives that must be balanced against sustained yield forest management and thereby reduce the annual productive capacity that will be offered for sale. So from our perspective, you know, that those terms can't be used to justify reserving 80 percent of land for something other than permanent forest production on a sustained yield basis. And there's no dispute that these reserves, one, contain timberlands, two, are in fact reserved for different purposes. Our land use allocations described in the plan that, quote, do not have objectives for sustained yield timber production. And that's the Joint Appendix 1825 and 26 and 2145. Moreover, those lands are excluded from the calculation of the annual productive capacity that has to be offered for sale each year. And that's 1825 and 26 and 2145. And those are the basic reasons that the district court ended up finding that the RMPs of the plans violated the ONC Act. So going beyond... Is it your position, counsel, is it your position that the secretary has no discretion to manage these lands other than for timber production? Is that what you're trying to tell us? That's what you seem to be saying. And is that the only way you can win? We would have to find the secretary has no discretion to do anything but manage these lands to produce timber. It's our position, Judge Pan, that the secretary must manage land for permanent forest production on a sustained yield basis. Within that discretion, within how you manage on a sustained yield basis, you can do a lot of different things. Why don't you answer my colleague's question? It really is, it really leaps out. I'd really like to hear your answer to the question that she raised. And what I'm saying is that there is discretion, in fact. There's discretion within the sustained yield mandate to regulate the rate, the timing, sequence, location of harvest in any given area. So that allows for... I understand your answer to be the secretary has no discretion to manage this land for any purpose other than timber production. But within the goal of timber production, the secretary has discretion. Is that your position? And that's the only way you win. If we would have to hold the secretary has no discretion to manage this land for any purpose other than timber production. And that is because this is a unique, dominant use of that. This is not like other federal land management strategies. But you agree with me that that's the only way you win? Well, I think that is the way we win. And I think that is right. I think that the statute is abundantly clear that this land shall be managed for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principle of sustained yield. And so what about the Endangered Species Act? We haven't gotten... What about the Endangered Species Act? And it's the Endangered Species Act. So the Endangered Species Act came out afterwards and, you know... And it doesn't apply here? Doesn't apply? Well, it does apply. It applies, absolutely. But it applies in the narrow circumstances that the National Association of Home Builders said it does. It applies to the discretionary acts that BLM can undertake. So here, for example, I mean, we don't want to say that BLM can't comply with the ESA. It can and must comply with the ESA, but only within the bounds of its discretion. But you said they have no discretion. I did not say that, Your Honor, with all due respect. I said there is discretion with the location of cutting, the rate of cutting, the sequence of cutting. All of that is something that's done. Sustained yield management doesn't mean you go in and liquidate. It means you cut some here this year, you cut some there this year. Okay. So can you explain how that would work? How would the Secretary comply with the Endangered Species Act within the bounds of what you say he has discretion to do? Sure, sure. The Secretary would go back and consult with Fish and Wildlife Service about how to develop a plan for conducting sustained yield management that included the entirety of the estate of the OSC lands. And what if it's incompatible? Well, we don't want, we don't know that it would be. But if it were, what would happen? I'm just interested in hearing this question. If it would be that you go through the process of getting a biological opinion, there would be a jeopardy determination.  Yes, I understand the process. My question is, what if that all shakes out and it says it's incompatible? You cannot manage this land for timber production consistent with the Endangered Species Act. What happens? We would be in a very different position then. And that didn't happen here. What happened here was that the lands were set aside in advance. 80% of the lands were set aside before the fact, and the consultation only took place afterwards. And I see I'm out of time. No, I want to ask you one more question. You have any authority supporting your proposition that the notion of sustained yield does not include protecting watersheds, regulating steam flow, contributing to economic stability, providing recreational facilities? Is there some authority that says that? See, you're talking about sustained yield in a way that says, I win. That's your definition of sustained yield. I'm looking at statutory language which says, I don't understand his argument. Do you have something to support your argument that these other purposes are not within the compass of sustained yield? Because I didn't see it. If it's there, I'm really happy to look at it. Where is it? Senator, it may be that, as I listen to your question, it may be that we're just missing each other a little bit on this point. A lot. Okay. And all I want is for you to point me to an authority that defines sustained yield. I want to narrow it as tightly as I can in the clipped way in which you're doing it. That's all I want. Please don't go beyond that. Just go with my limited mind. Give me an answer that I can digest easily. Because you have to understand what you're doing. You stood for your 15 minutes and said, sustained yield means I win. And I win because none of these other factors are part of sustained yield. What authority says that? Well, the term is not defined in the statute. It was discussed extensively in the legislative history. Former Chief of the Forest Service described it as cutting as much timber as you can based on the annual growth while preserving the underlying principle. That's a J-A-24. While preserving what? While preserving as much as you can of the principle. Yeah. That's a J-A-2479 and 2497. Is there any source, any case, any regulation, any statute that defines it to ignore the provisions in the statute that I'm looking at? Well, the case that I would actually refer you to is the Ninth Circuit case in Headwaters. And in that case, the Ninth Circuit explained that the ONC Act envisions timber production as a dominant use. It also went on to explain that, quote, exempting certain timber resources from harvesting to serve as wildlife habitat is inconsistent with the principle of sustained yield. That's at page 1183 to 1184 of the opinion. It also went on to say that doing so would be inconsistent with the purpose of the ONC Act, which Headwaters Court found to be, quote, to provide the counties in which the ONC Act land was located with a stream of revenue, which has been promised, not delivered by the Chamber of Commerce Provestment Act. So those would be the authorities that I would point to. Okay. Thank you. Thank you. I'll pass it on now to Ms. Weiss. All right. Mr. Toth, why don't you... Oh, I'm sorry. Ms. Weiss. May it please the Court, my name is Julie Weiss, and I represent the appellees in Swanson, where the District Court properly held that BLM failed to comply with the ONC Act in violation of the APA. Just as the Court should affirm the District Court's decision in the monument plan that merits and as to remedy. Judge Edwards, before I begin my principle argument, I would like to refer you to one thing that addresses the question about authority that might have talked about the secondary benefits as we view them from the ONC Act. And that is in 1938, when the federal government promulgated the first regulations for timber harvest under the ONC Act, it actually referred to sustained yield timber harvest regenerate, quote, secondary benefits, end quote. That's found at 3 Fed Reg 1796. The what? Say that again. Your sentence, I didn't hear. It was 3 Federal Register 1796. No, what did you say? It was in 1938, so contemporaneous with the passage of the Act. And what the government did was promulgate regulations for harvest under the ONC Act. Right. And it said, by managing sustainably, there would be, quote, secondary benefits. And it was referring to the secondary benefits like protecting stream flow and things of that nature. But that I just wanted to give you that citation. My job here is to talk about a different creature, which is a failure to act creature. And what I'm going to do, the district court found all the requisite requirements for actionable agency non-action. What I'm going to do is go right to two Supreme Court cases that help us understand why this case should be adjourned. In Lujan, first of all, your honors, 497 U.S. 871, that case was a non-actionable programmatic challenge where the litigants said, we're challenging a land withdrawal review program. That was a name that they had created. It was not, there was no such thing. And they wanted it set aside. In reality, what there was, was well over an amalgam of more than a thousand different land review classifications and land withdrawal revocations. And that was what the court said. That's programmatic. We're not going to interject ourselves into the day-to-day operations of BLM. Here, the final agency action was BLM's failure to sell or offer for sale the declared annual sustained yield capacity. So this is not Lujan. This is not SUA either. Can I ask you about Lujan? Because Lujan did talk about the continuing and thus constantly changing operations of the BLM. And I think your issue kind of turns on whether this was a discrete act or not, right? Because the relevant provision within the APA requires under SUHA that the agency fail to take a discrete agency action that it is required to take. I think we're looking at whether this is discrete or not. And here we're talking about something the secretary has to do every year annually. And to me, that seems to indicate that's not discrete. And I'm looking at other cases that applied this discrete standard. I was not able to find any case that applied to a continuing ongoing every year obligation, which also involves looking at reasonable prices in a normal market, which sounds kind of discretionary to me. So to me, there are two aspects of this that indicate this is probably not a discrete action and therefore not subject to the judgment that was rendered. Your Honor, this does involve a discrete action. And I'll address both of your points. First of all, it is discrete because even though BLM has to make a number of determinations before it declares that allowable sales quantity, once it declares that number and it chooses to declare it in plans, that number has to be met on an annual basis. And so the discrete action is the equivalent of a rule. We have to find something that is the equivalent of something in the APA, a rule of order. It is the equivalent of a rule, an agency statement of general or particular applicability in future effect. But the action is the sale. That's what you're trying to compel. The sale doesn't happen until it can determine whether there's a reasonable price in a normal market, and the agency has to do it every year. The action that we're trying to compel is compliance with the declared allowable sale quantity. It is effective through timber sales, but the challenge here is not to a timber sale program or to individual timber sales or the lack thereof. The challenge is to a failure to meet a declared ASQ. So this case did not involve a challenge to a plan. It involved a challenge to a failure to comply with an obligation under the ONC Act. The BLM declares the allowable sale quantity, but it was not actually putting that into effect. Right. You're trying to compel the sale. The ASQ was declared. Now you're saying just sell that, right? We're saying comply with the ASQ, comply with the ONC Act, because you have said that's the amount we're going to sell, and you haven't done that. You need to do that on an annual basis. I understand. But I think the issue is whether selling it is a discreet act. And in the context of something you have to do every year, and every year you have to, or the secretary has to determine what are the reasonable prices on a normal market does not sound discreet. I think Justice Scalia would be shocked to hear your interpretation of his opinion in what 706.1 means. I mean, what he was trying, if I remember that correctly, what he was trying to say when you come in and say, we want to compel the agency to do what it is we're saying. He said, you better be able to show me something that is absolutely clear. There's no dispute whatsoever. There's no discretion, nothing loose. One is one, and they haven't done one. That's not the case you're presenting. Your Honor, I disagree. With my interpretation of Justice Scalia's opinion or my interpretation of you? Your interpretation of me, Your Honor. OK. And I will refer you to SUA, because I think SUA offered an interesting example. And it was a hypothetical example. There the court said, let's look at the Telecommunications Act, where the FCC was required to promulgate regulations within six months. This was a hypothetical. And it said, if they didn't do that, that would be actionable. And it was actionable because there would be a specific statutory command requiring an agency to act by a certain deadline. And here, we have that command. We declare that ASQ, now go comply with that ASQ. And it has to happen by a certain deadline. It has to happen annually. So I think that example in SUA is actually very helpful. I'm almost out of time. Can I briefly address your reasonable pricing question? Yes.  market forces, Your Honor. And if we look at the legislative history, I'm going to refer you to JA 4994 through 95. And I'm going to read to you. The legislative history showed that the parties were familiar with that, because something very similar had been used in the Chamber of Affairs Act of 1916. And what they said was, we understand it to be timber operators reach a section of ONC They make application for that particular track to be put up for competitive bidding. They make their bid for it. And it is then put on the market for the resulting sale. It's not difficult. It's simple. It's common sense. It's market forces. It's simply selling or offering timber to comply with that declared annual sustained yield quantity. And I am out of time. If the Court has any further questions, I'm happy to answer them. But I would just ask Your Honors to remember that in 1937, Congress set these lands aside for the dominant use of sustained yield timber production. Dominant use means that conflicting uses are disallowed. And the President and BLM should not be allowed to flout Congress's express intent for these lands. So we would ask you to affirm the District Court in all respects, monument in plan, and certainly in Swanson. Are you aware of any precedent that finds an action discreet when it's an ongoing every year kind of obligation? Your Honor, I think an annual obligation, I can't give you an example. I think an annual obligation probably is not infrequent. And it is discreet. Okay, thank you. Any recent examples of a District Court permissibly taking control of the agency's operation to its satisfaction to see whether or not they follow the rules in an ongoing way? Is there some authority for that? I mean, I know it happens in some context. That's a strange, strange order. Your Honor, there are certain cases where courts retain jurisdiction. Anything that's comparable here, where a District Court, this is a regulatory authority? Interior does its work each year, and the District Court judge says, bring it to me each year, and I'm going to look it over and see whether I agree? Well, Your Honor, in your track decision, which you authored, there the court retained jurisdiction, required periodic reporting. And you actually said in that opinion that if the parties felt like something was needed to be brought to the court's attention, the parties were welcome to come and petition the court for additional assistance. But I don't think it's uncommon to retain jurisdiction and to require periodic status reporting. In Swanson, the only thing the government really objects to is the fact that the appellees get to comment on their status reports. So the court is not inserting itself into the day-to-day operations. It simply compelled compliance with the statute, and then it stepped back and went no further. Thank you, Your Honor. All right. Mr. Tom, why don't you take two minutes? And can I ask you, I know one of you all would have told us, but there's been no resolution of the Murphy case out of the Ninth Circuit. Is that correct? That's correct. It was argued on August 30th. I believe a link of mine is in the gallery today. We're still submitting. We're waiting for a decision. Judge Henderson, I'd like to start with your question to my colleague, Ms. Boyle, during her presentation, where you asked whether the record showed that from 1937 on, the Secretary had applied the O&C Act for these other purposes, including protecting watersheds. I'd point the court to the 1938 regulation that we discussed in our blue brief, 46 and 47. It said that scenic strips of merchantable timber could be reserved in certain locations, including sidelight streams, roads, and trails for those other non-timber purposes. That was part of the exercise of sustained yield very early on, the first regulation after the 37th was enacted. What's your response on sustained yield? The question I raised, and counsel on the other side points to headwaters. For a narrow definition of it. So that misses the later case from the Ninth Circuit that, like Seattle Audubon Society, that grappled with the Northwest Forest Plan and the reserve requirements. And although the O&C Act wasn't at issue on appeal, it was a claim made by timber industry litigants in the district court in the Lyons case. And they just abandoned that argument on appeal. The government won. That was different from headwaters because it actually grappled with reconciling the Endangered Species Act with the O&C Act. So that's more on point than headwaters. Do you have any answer to the question that I raised? Is there something that tells me what sustained yield means beyond what intuitively it appears to mean from the words of the statute? Is there something that amplifies that somewhere? We haven't presented in our brief a deep historical dive into forestry. I don't want it to be deep or historical. I just want something authoritative. Is there anything? We haven't presented anything. But that's so strange that all of you have done this. I mean, that's a crucial concept here. It's really not terribly well explained by any of you. So if I'm criticizing, I'm doing it across the board. No, I understand. And like I said, we didn't do a deep historical dive. But it is a concept from forestry. At the time, it was a conservation concept. Foresters like Gifford Pinchot, who saw the federal agencies as stewards of the land management. And so they were protecting the resources in the long term, not just for extraction, but also for preservation. And so you could have that resource intact over the long term. Briefly regarding the monument, my friend Mr. Bechtol made a comment about arbitrary and capricious review over rational basis review. This just highlights. This is a review of a presidential action. You have to look to the face of the proclamation. And Judge Edwards, to address your point, the proclamation makes a heavy of findings about the importance of the region that was declared as a monument. They haven't challenged the monument as violating the terms of the Antiquities Act. It's valid under that statute. And that's the end of the inquiry, in our view. There is no rational basis inquiry, arbitrary and capricious inquiry, to the mind of the president. Briefly on that, I think I touched on the plans. So I'll move on to Ms. Weiss's presentation about Swanson. Judge Penn, I think you have it right. This is an ongoing obligation of the agency to administer the program every year. In the same way that you cannot challenge that ongoing program under Lujan, you cannot compel the program to be administered in a particular way under SUA. So I think that for all these reasons, we would ask for reverse the district court structure. All right. Thank you.
judges: Henderson, Pan, Edwards